UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| TRI-CITY COMMUNITY ACTION PROGRAM, INC. | ) | Chapter 11 |
| | ) | Case No. 15-11569-JNF |
| Debtor. | ) | |
| | ) | |

**AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S LIQUIDATING CHAPTER 11 PLAN DATED APRIL 14, 2017**

**Dated:  May 24, 2017**

- **Voting Record Date: May 24, 2017**

- **Voting Deadline by which Ballots must be received: July 5, 2017 at 4:30 p.m., ET**

- **Deadline by which to file and serve objections to Confirmation of the Plan: July 5, 2017 at 4:30 p.m., ET**

- **Hearing on Confirmation of the Plan: July 10, 2017, at 11:30 a.m., ET**

---

**THE PLAN IS SPONSORED BY THE DEBTOR.**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS SUPPORTS CONFIRMATION OF THE PLAN**

**THE DEBTOR AND THE COMMITTEE URGE HOLDERS OF ALLOWED CLAIMS IN CLASS 7 (GENERAL UNSECURED CLAIMS) TO VOTE TO ACCEPT THE PLAN.**

---

# I. **Introduction**

Tri-City Community Action Program, Inc. (the "Debtor") provides this Disclosure Statement to all of the Debtor's known creditors in order to supply the information you will need in exercising your right to vote upon the Debtor's Liquidating Plan dated April 14, 2017 (the "Plan"). A copy of the Plan is attached to this Disclosure Statement as Exhibit A. All terms defined in the Plan have the same meaning herein unless otherwise noted.

If you hold a Claim in Class 2, Class 6 or Class 7 (described below), a ballot for your use in voting to accept or reject the Plan is enclosed. Instructions for completing and returning the Ballot are printed on the Ballot itself. **IN ORDER FOR YOUR VOTE TO COUNT, THE BALLOT REFLECTING YOUR VOTE MUST BE RECEIVED AT THE ADDRESS DESCRIBED BELOW IN SECTION XII.A, "ACCEPTANCE OF THE PLAN," NO LATER THAN 4:30 P.M. PREVAILING EASTERN TIME ON July 5, 2017.**

Except where specifically stated otherwise, the information contained in this Disclosure Statement is based upon information supplied by the Debtor and believed by the Debtor to be accurate and true. The Debtor has done its best to ensure that the information is correct and complete, but it is impossible to represent that the information contained in this Disclosure Statement is without error.

No representations concerning the Debtor or the Plan are authorized other than as set forth in this Disclosure Statement. Although this Disclosure Statement describes the Plan in summary and in detail, it is recommended that you review the Plan itself for a definitive understanding of its terms.

The approval by the Court of this Disclosure Statement does not constitute an endorsement by the Court of the Plan, or a guarantee of the accuracy or completeness of the information contained in this Disclosure Statement. The Debtor has prepared this Disclosure Statement to disclose that information which, in its opinion, is material, important, and necessary to evaluate the Plan. The material contained in this Disclosure Statement is intended solely for that purpose and solely for the use of known creditors of the Debtor. This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan. This Disclosure Statement summarizes the terms of the Plan but the Plan itself qualifies all summaries. If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling. Without limiting the generality of the foregoing, nothing in this Disclosure Statement or the Plan shall be deemed an estoppel or waiver of any right or remedy of the Debtor or its bankruptcy estate.

When and if confirmed by the Bankruptcy Court, the Plan will bind all holders of claims against and interests in the Debtor whether or not they are entitled to vote or did vote on the Plan and whether or not they receive or retain any distributions or property under the Plan. Thus, all holders of claims against the Debtor are encouraged to read

2

this Disclosure Statement and its appendices carefully and in their entirety before deciding to vote either to accept or to reject the Plan.

With respect to contested matters, adversary proceedings, and other pending, threatened, or potential actions (whether or not pending), this Disclosure Statement and the information contained herein shall not be construed as an admission or stipulation by any entity, but rather as statements made in settlement negotiations governed by Rule 408 of the Federal Rules of Evidence and any other rule or statute of similar import. Furthermore, the absence of a pending litigation and/or the absence of disclosure or notice of any cause of action, affirmative claim, counterclaim or avoidance action by this Disclosure Statement or otherwise should not and may not be relied upon by any creditor or as an indication, representation, or acknowledgement that such cause of action, affirmative claim, counterclaim, or avoidance action does not exist or that such claims will not be pursued following confirmation of the Plan. Moreover, nothing in the Plan or this Disclosure Statement may be used or relied upon by any party as a basis to assert that the Debtor, its bankruptcy estate, the Official Committee of Unsecured Creditors of the Debtor (the "Creditors' Committee"), or the creditor trustee to be appointed pursuant to the Plan have waived any causes of action, affirmative claims, counterclaims, or avoidance actions.

**The Debtor and the Creditors' Committee recommend that you vote to ACCEPT the Plan.**

## II.    Summary of the Plan and Means of Implementation of the Plan

The Plan is a liquidation plan and does not contemplate the financial rehabilitation of the Debtor or the continuation of its operations. The major components of the Plan include:

(i)     the sale of the Debtor's residential real properties located at 22 Charles Street, Malden, Massachusetts and 115 Washington Street, Malden, Massachusetts at which the Debtor has operated subsidized low income housing (together, the "Property"), pursuant to an asset purchase agreement (the "Property APA") whereby the purchaser of the Property will continue to operate the Property as low income housing and will assume certain existing mortgage debt as specified in the Property APA;

(ii)    an agreement resolving disputes involving the Debtor, Eagle Bank, and the Massachusetts Department of Housing and Community Development ("DHCD")[1] arising out of prepetition application by Eagle Bank of certain funds made available to the Debtor under the federal Low Income Housing Energy Assistance Program administered by DHCD (the "LIHEAP Settlement Agreement"),

(iii)   utilization of proceeds of the sale of the Property, and an agreement with National Grid to share certain proceeds it receives under the LIHEAP Settlement Agreement, together with the Debtor's other funds on hand, to

---

[1] As of April 14, 2017, the participation of DHCD in the LIHEAP Settlement Agreement remains subject to review and approval of the Massachusetts Office of the Attorney General.

pay the expenses of administering the Debtor's Chapter 11 case and to pay certain secured claims, priority claims, and a distribution to general unsecured creditors, and

(iv) the transfer of the Debtor's interest in a $100,000 promissory note issued by 54 Eastern Ave Malden LLC (the "Eastern Avenue Note"), and the causes of action held by the bankruptcy estate, to a Creditor Trust, to be administered by a Creditor Trustee for the benefit of the Debtor's general unsecured creditors holding allowed claims against the Debtor and its bankruptcy estate.

The Debtor's principal assets include the supported housing real estate properties; approximately $24,000 of cash (including $20,720 of proceeds of sale of two school buses held in escrow by counsel to the Debtor);  and causes of action arising out of the conduct of the Debtor's prepetition business and financial affairs, as discussed in detail below.  Certain expenses of administration of the Debtor's bankruptcy case, such as compensation to counsel for the Debtor and the Creditors' Committee, will be paid incident to confirmation of the Plan and, to the extent not paid by the Debtor, will be assumed by the Creditor Trust.  Upon the Effective Date of the Plan, distributions to certain secured creditors will be made pursuant to the Property APA, while other secured liabilities (certain specified mortgages) will be assumed by the purchaser of the Property, all as more particularly described below and in the Plan.  The funds to be paid by Eagle Bank under the LIHEAP Settlement Agreement are earmarked for payment of the Debtor's liability to the sole creditor in Class 6: National Grid, the utility that made residential fuel deliveries that were supposed to have been subsidized with LIHEAP funds that Eagle Bank applied to other liabilities.  National Grid has agreed to share a portion of the funds distributed to it under the LIHEAP Settlement Agreement with general unsecured creditors, thereby assuring that such creditors will receive payment of at least a portion of their claims against the Debtor. General unsecured creditors (including National Grid) will also be entitled to receive a *pro rata* distribution of any funds generated from administration of the Creditor Trust.

The Plan classifies the LIHEAP Claim of National Grid in Class 6. The LIHEAP Claim is separately classified because of distinct legal rights relating to that claim, as discussed in Section V.D, below.

The Plan is a "pot plan" for general unsecured creditors, in that it provides fixed or definable assets for distribution to holders of Allowed General Unsecured Claims (rather than a fixed percentage dividend).  Because certain of the assets, such as the Eastern Avenue Note and Estate Causes of Action, are not yet liquidated, and because Allowed Claims have not yet been fixed (pending potential objections to asserted claims and resolution of such objections), the precise percentage distribution is not now known, or knowable.  However, the Debtor currently anticipates that Allowed General Unsecured Claims (Class 7 Claims) will total approximately $1.297 million, and that funds available for distribution to Allowed Class 7 Claims will total approximately $224,500, excluding the Eastern Avenue Note and excluding any recovery on account of the Estate Causes of Action.  Based on these assumptions, the Debtor currently

anticipates that holders of Allowed Class 7 Claims will receive a distribution of approximately 17 percent of the amount of their allowed claims.

In addition, Estate Causes of Action, including claims against two former officers of the Debtor, will be transferred to a Creditor Trust. Unless paid prior to the Effective Date, the Creditor Trust will also hold for collection a contingent promissory note received by the Debtor during the Chapter 11 case from 54 Eastern Ave Malden LLC, in connection with an earlier settlement. The recovery on Estate Causes of Action and the note are speculative, and could range from zero to $100,000 (in the case of the note) and from zero to approximately $1 million (in the case of the Officer Claims). Holders of Allowed Claims in Class 7, National Grid (in the amount of $300,028.58) and the Massachusetts Department of Housing and Community Development ("DHCD") (in the amount of $50,000) will each receive a pro rata share in the Creditor Trust. Each creditor's pro rata share of the Creditor Trust is calculated as the percentage resulting from dividing the holder's Allowed claim by the total amount of claims (approximately $1.65 million). The beneficiaries' range of recovery from the Creditor Trust is projected to be between zero and 66%. Because the liquidation recovery on the assets in the Creditor Trust is speculative, the Debtor cannot estimate the percentage recovery for creditors with more precision.

The process of determining which Claims should be Allowed takes time. During the period when any Claim is Disputed, a reserve equal to the amount that would be paid if the Claim were Allowed in full must be set aside. In order to distribute as much Cash as quickly as possible, the Plan provides for interim distributions to creditors whose Claims have been Allowed.

For a complete explanation of the classification and treatment of creditor claims under the Plan, please refer to the discussion in Section V, "Classification of Claims and Their Treatment Under the Plan," below, and to the Plan itself.

### III.    Description of the Debtor

#### A.    The Debtor's Business

The Debtor was formed in 1978 as a nonprofit corporation organized under the laws of the Commonwealth of Massachusetts. The Debtor was formed as a social services provider to work toward the elimination of poverty -- and its causes and effects -- in the cities of Everett, Malden and Medford, Massachusetts and surrounding communities by opening to individuals and families the opportunity for education and training, the opportunity to work, and the opportunity to live in decency and dignity.

Toward these ends, the Debtor since its formation focused its efforts on development of social service programs and related infrastructure for the benefit of lower income residents of its service area. These programs have included provision of subsidized low income housing, subsidized heating fuel deliveries, home weatherization assistance, Head Start preschool education programs, homeless prevention and legal and computer services. The Debtor maintained a principal place of business at 110

Pleasant Street in Malden, Massachusetts. The Debtor also owns real property located at 22 Charles Street in Malden, and at 115 Washington Street in Malden, at which the Debtor operated subsidized residential housing communities.

The Debtor funded its operations through a variety of sources, including federal and state grants and subsidies, corporate and private donations, and fundraising activities. Principal funding sources included federal grants to provide Head Start programs, subsidized low-income housing, mortgage financing of the Property provided through DHCD, and subsidized financing of the Debtor's LIHEAP initiatives sponsored by federal and state authorities including DHCD.

As a nonprofit organization, the Debtor is exempt from federal and state income taxes.

**B.    The Debtor's Decision to File for Bankruptcy**

The Debtor had operated for years with the above-described collection of grants and fundraising supporting its slate of programs. But two issues in late 2014 lead to the Debtor's cessation of operations and the need to file this bankruptcy case.

Over the years, financial reporting to the Board, including audited financial statements filed with the Massachusetts Office of the Attorney General, reflected that the Debtor's various programs were at least break-even. In late November 2014, it was disclosed by the executive director to the Debtor's Board of Directors that several of its programs were in fact running at a deficit, a circumstance that had not been previously revealed by the financial reporting provided to the Board. In this disclosure, the Board learned that some grant funding for the then-current fiscal year was being used to pay prior year expenses. The Board immediately halted that practice, and launched an internal investigation which also revealed that proper grant accounting had not always been followed, with comingling of grant funds resulting in some grant funds being spent to support operating expenses of programs not covered by particular grants. In early December 2014, the Board accepted the resignation of its executive director and the Debtor's comptroller was terminated. The Board reported its findings to DHCD, the state agency with oversight over the grants at issue.

DHCD and the Massachusetts Office of the Attorney General conducted separate investigations of the Debtor, with which the Debtor and its directors and employees cooperated. In discussions with DHCD, the Debtor agreed to surrender its designation as the community action agency for its service area, and to wind up its DHCD-funded programs. DHCD determined that the Debtor's LIHEAP and Head Start programs should be transferred to another agency for operations, and that transfer occurred in December 2014 and January 2015. DHCD also directed its funding for the supported housing programs to that agency for fiscal oversight, although the properties remained owned by the Debtor. During this period, the Debtor was working to transfer or wind up its remaining programs.

During this time period, on December 5, 2014, Eagle Bank applied $296,400 -- a substantial portion of the Debtor's funds on hand at the time-- from an account held by the Debtor without any notice to or consent from the Debtor. Eagle Bank used these funds to repay in full approximately $200,000 in lines of credit and a $96,000 mortgage loan extended by the Eagle Bank to the Debtor.  The Debtor sought the return of this setoff, alleging that the funds taken by Eagle Bank were restricted federal grant funds that legally could be used only for their intended grant purposes. The Debtor was unable to negotiate a timely acceptable resolution of this dispute.

The Debtor, having just experienced an abrupt transfer of some of its programs, and the need to wind up its existing operations while also facing a liquidity crisis occasioned by the Eagle Bank dispute, laid off all but one of its remaining employees and closed down its "Street Team" legal outreach and Cyber Café programs. The Debtor retained Casner & Edwards, LLP to advise it on winding up its operations in accordance with rules applicable to nonprofit organizations. With counsel, the Debtor evaluated out-of-court options to accomplish its orderly dissolution. Because the amount of debt secured by the housing properties exceeded the value of those assets, and because of lawsuits (both pending and threatened) which would upset a ratable out-of-court distribution to creditors, the Debtor determined to file for Chapter 11 bankruptcy to facilitate an orderly liquidation of its remaining assets and an equitable distribution to all of its creditors and dissolution under Massachusetts law. The Chapter 11 case was filed on April 23, 2015 (the "Petition Date").

### C.    Summary of the Debtor's Assets and Liabilities

As of the Petition Date the Debtor had approximately $3,461,000 of assets at book value.  This total includes the book value of the two parcels of real property to be sold under the Plan—22 Charles Street in Malden, valued at $950,000, and 115 Washington Street in Malden, valued at $1,950,000.  The Debtor also held approximately $136,000 in bank accounts. The remaining significant assets included a rent receivable of $3,790, a conditional expense reimbursement claim of $125,000, a claim of nearly $300,000 against Eagle Bank for improperly applying government trust funds (which claim is to be resolved through the LIHEAP Settlement Agreement that constitutes an integral component of the Plan), and two school buses having negligible book value but which the Debtor was able to sell during the Chapter 11 case for $20,720.

As reported on the Debtor's Schedules of Assets and Liabilities, as amended, total liabilities were approximately $4,165,000 as of April 23, 2015, including approximately $2,819,000 of secured debt (principally, mortgage debt on the two parcels of real estate in Malden), and approximately $1,345,000 of general unsecured debt.

### D.    Prepetition Financing of the Debtor and Resulting Liabilities

Secured Debt

Secured claims against the Debtor and its property include several mortgages (and related collateral assignments of leases and rents) against the Property, a trustee

process attachment against the Debtor's bank account with Eagle Bank, and Eagle Bank's contingent claim secured by mortgages against the Property.

As disclosed in the Debtor's schedule of creditors holding secured claims filed with the Bankruptcy Court, Community Economic Development Assistance Corporation ("CEDAC") holds (i) a mortgage claim against the property located at 115 Washington Street, Malden, Massachusetts in the amount of $1,397,056.00 and (ii) mortgage claims against the property located at 22 Charles Street, Malden, Massachusetts in the aggregate amount of $604,716.00 (including unliquidated and disputed claims). CEDAC's mortgage claims will be assumed by the purchaser of the Property in accordance with the terms of the Property APA, all as discussed in more detail below.

The Debtor's schedule of creditors holding secured claims filed with the Bankruptcy Court lists claims held by Malden Redevelopment Authority as member of and agent for North Suburban Consortium ("MRA") and more particularly described in the MRA's two proofs of claim filed in the Case, as follows: (i) a contingent, unliquidated mortgage claim against the property located at 115 Washington Street, Malden, Massachusetts in the amount of $500,000.00 [Claims Register #15-1]; and (ii) a mortgage claim against the property located at 22 Charles Street, Malden, Massachusetts in the amount of $239,167.68 ) [Claims Register #14-1]. The basis for these claims is recapture of certain funding grants, including in the event the two properties are utilized for purposes other than low income housing. Metro North Housing Corp., the purchaser of the Property pursuant to the Property APA, will assume (with agreed-to modifications) the Debtor's obligations to MRA and will continue to operate the Property as low income housing. Therefore, these claims will not ripen into actual liabilities of the Debtor's bankruptcy estate, and accordingly the MRA's claims are treated as unimpaired for purposes of the Plan.

As disclosed in Debtor's schedule of creditors holding secured claims filed with the Bankruptcy Court, Brandano Plumbing & Heating holds a trustee process attachment on the Debtor's bank account with Eagle Bank to secure an asserted claim of approximately $45,000. The Debtor disputes this claim, and asserts its own claims against Brandano. The Debtor expects that these disputes will be resolved by agreement with Brandano, or alternatively adjudicated by the Bankruptcy Court in connection with any lawsuit filed by the Debtor asserting its claims against Brandano and/or objecting to Brandano's disputed claim against the Debtor.

According to the Debtor's schedule of creditors holding secured claims filed with the Bankruptcy Court, Eagle Bank holds a contingent secured claim against the Debtor, in the amount of $0.00 as of the time the Debtor filed its bankruptcy case. Eagle Bank has filed a proof of claim asserting its contingent secured claim, wherein the bank asserts that the bank will hold a claim, secured by a lien against all of the Debtor's assets, for any disgorgement of LIHEAP funds seized by the bank prepetition. This contingent secured claim is addressed by the LIHEAP Settlement Agreement, which provides for a $100,000 payment to the bank on the Effective Date of the Plan when the closing of the sale of the Property pursuant to the Property APA occurs.

Unsecured Debt

As disclosed in the Debtor's Schedules of Assets and Liabilities as amended, as of April 23, 2015, the Debtor's accrued unsecured liabilities totaled approximately $1,345,000, including accounts payable and certain accrued expenses due to third parties for goods and services supplied prior to the Petition Date. Following the Bar Date, the amount of unsecured claims asserted (either via claims scheduled as undisputed and non-contingent or via filed proofs of claim) is approximately $1,297,000.

## IV.   The Chapter 11 Case

The Debtor filed its voluntary petition commencing this Chapter 11 case on April 23, 2015—the Petition Date. The purpose of the Chapter 11 filing was to provide the best means to realize the value of the Debtor's assets and provide for the efficient and equitable distribution of liquidation proceeds to the Debtor's creditors in the manner provided by the Bankruptcy Code.

### A.   Initial Matters

Upon filing its Chapter 11 case, the Debtor attended to various matters concerning the administration of its bankruptcy case, including preparation of schedules and statements detailing the Debtor's assets, liabilities, and prepetition financial affairs, submission to the Bankruptcy Court of a motion to employ bankruptcy counsel, and compliance with the duties and reporting requirements attendant to Chapter 11 debtors in possession, including those required and administered by the Office of the United States Trustee, a federal agency having administrative oversight in bankruptcy cases.

### B.   Creditors' Committee

Since it is usually impractical for unsecured creditors to participate directly in a Chapter 11 case, bankruptcy law provides for an official committee of unsecured creditors to represent the interests of the unsecured creditors as a group (which usually selects counsel to represent the committee at the expense of the bankruptcy estate). The membership of the creditors' committee typically includes the largest unsecured creditors who are willing to serve, provided that they are representative of the creditor body.

The Official Committee of Unsecured Creditors ("Creditors' Committee") appointed in the Debtor's Chapter 11 Case is composed of the following creditors:

Michael A. Sticca
d/b/a Sticca Contracting Company
376 Washington Street
Malden, MA 02148

Creditor Rep for Sticca Contracting Company:
Kevin J. Kiely
85 Eastern Avenue
Gloucester, MA 01930

Joseph DeRenzis, Trustee
A.M.G. Realty Trust
41 Rivers Lane
Melrose, MA 02176

Glen Alexander
d/b/a Alexander Construction
25 Bond Street
Reading, MA 01867

Counsel to the Creditors' Committee is:

Kate E. Nicholson, Esq.
Nicholson Herrick  LLC
24 Bishop Allen Drive
Cambridge, MA 02139
(857) 600-0508
knicholson@nicholsonherrick.com

The Debtor has worked closely with the Creditors' Committee on all significant aspects of this Chapter 11 case, including the development of the Plan and the settlements and other transactions through which the Plan will be implemented.  The Plan provides for the Creditors' Committee to designate the Creditor Trustee who will administer certain assets for the benefit of general unsecured creditors.

## C.    <u>Planned Sale of the Property [Property APA]</u>

The Debtor's principal prepetition activities centered on its operation of subsidized low income housing at the two Malden residential properties constituting the Property.  Upon filing for bankruptcy, the Debtor considered the continued operation of these properties for the benefit of affected low income residents to be an important goal even in the face of the Debtor's planned cessation of business and liquidation.  To that end, the Debtor pursued a sale of the Property that would ensure its continued viability as low income housing.  This goal is fully consistent with the Debtor's obligations and commitments to the various federal, state and regional public financing sources for the acquisition and operation of the Property, which are, in some instances, enforceable restrictions on the use of the Property. This effort led to the Property APA, whereby the Debtor will sell the Property to Metro North Housing Corp., a Massachusetts nonprofit organization.  The total consideration for the purchase includes purchaser's assumption of existing mortgage indebtedness (excluding the mortgage held by Eagle Bank).  Cash proceeds of the sale are expected to total approximately $306,000 and will be used to pay certain secured claims totaling approximately $112,000 (including the secured

10

claim of Eagle Bank).  After paying closing transaction costs of approximately $6,000, the Debtor expects that a balance of approximately $188,000 will be available to fund the Plan, including to pay the expenses of administration of the bankruptcy case and/or to permit payments on account of allowed claims. The total consideration under the Property APA (cash and mortgage assumption) is more than the Debtor could have received for the Property if it were marketed as commercial real estate.

The Property APA constitutes an integral part of the Plan, and will be implemented upon confirmation of the Plan and the occurrence of the Effective Date of the Plan.  The precise means of implementation of the Property APA are set forth in the Property APA attached as Exhibit D to the Plan, and in Sections 4.1 through 4.4. and 5.1 of the Plan.

### D.    Resolution of LIHEAP Disputes [LIHEAP Settlement Agreement]

One of the significant anti-poverty programs run by the Debtor was the Low Income Housing Energy Assistance Program ("LIHEAP") funded by the federal government and administered by DHCD.  Under this program, the Debtor contracted with energy providers (e.g., utilities and home heating fuel vendors) to provide home heating fuel to program participants (i.e., the residents of the Debtor's subsidized housing).  For the 2014 and 2015 home heating seasons, the Debtor had contracted with Boston Gas Company d/b/a National Grid for the provision of subsidized heating fuel. Under this arrangement, National Grid would supply heating fuel to program participants, and the Debtor would utilize LIHEAP funds advanced by DHCD to pay National Grid.

As of the Petition Date, National Grid was owed over $400,000 for heating fuel deliveries.  National Grid's receivable was high in part because of the application of LIHEAP funds by Eagle Bank. On or about December 5, 2014, without notice to the Debtor), Eagle Bank applied funds held in the Debtor's deposit account with the bank (the "Funds") in payment of the Debtor's loan obligations to Eagle Bank. Subsequently, the Debtor and DHCD each asserted that the Funds included a significant amount of LIHEAP funds that had been intended for use to pay National Grid.  The Debtor determined that diverted LIHEAP funds totaled $296,399.52, as reflected in the Schedule B disclosure of assets filed by the Debtor with the Bankruptcy Court.

During the Chapter 11 case, the Debtor, Eagle Bank, DHCD, the Creditors' Committee, and National Grid engaged in intensive discussions and negotiations concerning (i) what portion of the Eagle-Seized Funds are LIHEAP program funds that must be disgorged; (ii) the ultimate disposition of any such disgorged funds; (iii) the effect of any such disgorgement on Eagle's claims and liens; and (iv) the effect of any disgorgement on National Grid's claim for unpaid heating fuel deliveries.  These discussions and negotiations ultimately led to the LIHEAP Settlement Agreement that underpins the Plan.

The LIHEAP Settlement Agreement provides that, upon the Effective Date of the Plan, (i) Eagle Bank will pay $296,399.52 offset by the bank (the "LIHEAP Settlement Funds"); (ii) the LIHEAP Settlement Funds will be made available under the Plan for payment of National Grid's asserted and Allowed Class 6 claim for unpaid fuel deliveries; (iii) Eagle Bank will hold an Allowed secured claim in the amount of $100,000 that will be secured by and paid from proceeds of the sale of the Property; (iv) Eagle Bank will hold a general unsecured claim in the amount of $196,399.52.

The LIHEAP Settlement Agreement constitutes an integral part of the Plan, and will be implemented following confirmation of the Plan upon the occurrence of the Effective Date of the Plan. The precise means of implementation of the LIHEAP Settlement Agreement are set forth in the LIHEAP Settlement Agreement attached as Exhibit B to the Plan, and in Sections 4.4, 4.6 and 5.2 of the Plan.

### E.    The National Grid Sharing Agreement

Incident to the LIHEAP Settlement Agreement and that agreement's provision for payment of its claim, National Grid has agreed to share a portion of its Class 6 distribution with general unsecured creditors, so as to ensure at least some distribution to all creditors holding allowed claims against the Debtor. Under the Plan, National Grid is separately classified in Class 6, and will receive a fixed dividend of 30% of its Class 6 claim, retaining $128,584 of its Class 6 distribution and contributing $167,815.52 of its Class 6 distribution for distribution to Class 7 general unsecured creditors.

The National Grid Sharing Agreement constitutes an integral part of the Plan, and will be implemented following confirmation of the Plan upon the occurrence of the Effective Date of the Plan. The precise means of implementation of the National Grid Sharing Agreement are set forth in the National Grid Agreement attached as Exhibit C to the Plan, and in Sections 4.6 and 5.2 of the Plan.

### F.    Other Postpetition Events

#### 1.    Bar Date

Bankruptcy law provides for pre-bankruptcy claims against a debtor to be asserted in two ways: a creditor may file a proof of claim or, if its claim is listed on the schedule of liabilities filed by the debtor with the Court (the "Schedules") and is not listed therein as contingent, unliquidated or disputed, then this listing is the equivalent of a proof of claim. If a creditor files a proof of claim for an asserted liability that has already been listed in the Schedules, the proof of claim filed by the creditor supersedes and replaces the claim listed in the Schedules.

By order dated August 17, 2015 [Docket No. 59] (the "Bar Order"), the Bankruptcy Court established October 21, 2015 as the deadline for the filing of proofs of claim against the Debtors, subject to certain exceptions set forth in the Bar Order and summarized below. Notice of this deadline was mailed to all known creditors of the Debtors on August 17, 2015 and September 9, 2015. The Bar Order applies to

prepetition Claims, meaning Claims arising before April 23, 2015, when the Debtor filed its Chapter 11 petition.  Under the Bar Order, October 21, 2015 was established as the deadline for the filing of proofs of claim against the Debtors, except that the deadline for filing a proof of claim of the type described in Sections 502(g), (h), or (i) of the Bankruptcy Code is the later of (i) October 21, 2015 or (ii) 30 days after occurrence of the event giving rise to such claim.

For further information concerning the process by which prepetition Claims against the Debtor will be Allowed or Disallowed, see Section VI, "Allowance of Claims," below.  Claims arising on or after the Petition Date are subject to deadlines and procedures established by the Plan.  See below at Section VI.A.1, "Administrative Expenses in General."

### 2.    Sale of School Buses

During the Chapter 11 case, the U.S. Department of Housing and Urban Development ("HUD") sought relief from stay to take possession of and foreclose its alleged interest in two school buses that the Debtor had been utilizing in its operations. The Creditors' Committee discerned that the Debtor maintained a valuable interest in the two buses, and opposed the relief sought by HUD.  Negotiations among HUD, the Debtor, and the Committee led to an agreement whereby the two buses were sold for $20,720 to be utilized to help fund a plan of reorganization.  The sale proceeds have been held in escrow by counsel to the Debtor pending confirmation of a Chapter 11 plan, and will be utilized under the Plan to help fund a distribution to general unsecured creditors.

### 3.    Special Counsel to the Creditors' Committee

An essential function of any creditors' committee is to oversee and augment a debtor's investigation into possible claims and causes of action that the bankruptcy estate might pursue for the benefit of creditors.  Involvement of a creditors' committee in this process is especially important where a debtor or its management has participated in suspect transactions or mishandled the debtor's business or financial affairs.  In this case, concern arose about certain prepetition activities involving the Debtor, and the Creditors' Committee sought and obtained Bankruptcy Court approval to employ special counsel to investigate potential claims arising out of these (or other) suspect transactions.  The Committee hired Jager Smith, P.C., to assist it in investigating, including through discovery under Rule 2004, these potential claims. Jager Smith completed the investigation for the Committee, and made a demand on the Debtor's former chief executive officer and former comptroller (the "Officer Claims"). On April 12, 2017, the Court entered an order authorizing the Committee to pursue the Officer Claims. The Debtor is informed and believed that the Committee intends to retain new special counsel to pursue the Officer Claims.

### G.    Development of Plan

Incident to pursuing the LIHEAP Settlement Agreement and the Property APA, the Debtor determined that a Chapter 11 plan of liquidation based on the two transactions would provide the best means to liquidate the Debtor's remaining assets, wind up its affairs and provide the most expeditious and highest possible distribution to all creditors. As a result, the Debtor has prepared and filed the Plan which incorporates the LIHEAP Settlement Agreement, the National Grid Sharing Agreement, and the Property APA as integral components. The Debtor will work cooperatively with the Creditors' Committee and creditors toward confirmation and implementation of the Plan. See below at Section XIII, "Alternatives to the Plan," for a comparison of the projected timing and amount of distributions under the only available alternative to the Plan: conversion of the Debtor's Chapter 11 case to Chapter 7.

## V.   **Classification of Claims and Their Treatment Under the Plan**

The Debtor's liabilities and their treatment under the Plan, are described below in the following order:

| Class | Claims | Status | Voting Rights |
|---|---|---|---|
| 1 | City of Malden | Unimpaired | Deemed to accept |
| 2 | DHCD/CEDAC | Impaired | Entitled to vote |
| 3 | Malden Redevelopment Authority | Unimpaired | Deemed to accept |
| 4 | Eagle Bank | Unimpaired | Deemed to accept |
| 5 | Priority Claims | Unimpaired | Deemed to accept |
| 6 | LIHEAP Claim | Impaired | Entitled to vote |
| 7 | General Unsecured Claims | Impaired | Entitled to vote |

## A.   **Administrative Expenses**

### 1.   **Administrative Expenses in General**

Administrative Expenses under Bankruptcy Code Section 507(a)(1) consist of expenses incurred during the Chapter 11 case, including quarterly fees payable to the Office of the United States Trustee. Under bankruptcy law, these Claims are entitled to priority payment over all unsecured Claims arising before the Petition Date. Accordingly, the Plan provides that, except as otherwise agreed to by the holder of an Allowed Administrative Expense, each holder of an Allowed Administrative Expense will be paid the full amount of such Allowed Administrative Expense, in Cash, not later than the date on which initial distributions are made.

The Plan provides for two deadlines for creditors to assert Administrative Expenses, excluding Professional Fee Claims (subject to a different deadline) and quarterly fees payable to the Office of the United States Trustee: **for Administrative Expenses arising before April 1, 2017, the deadline is June 9, 2017**; for Administrative Expenses arising after March 31, 2017, the deadline will be established in the order confirming the Plan. All creditors will receive notices concerning these deadlines.

Administrative Expenses are not classified in the Plan, are unimpaired and are therefore not entitled to vote to accept or reject the Plan.

### 2.      Claims Related to Administration of Chapter 11 Cases

The lawyers, accountants and other professionals who have supplied services to the Debtors and the Creditors' Committee are entitled to seek compensation for their services pursuant to applications filed with the Bankruptcy Court. These applications will be filed shortly after the Effective Date and will encompass services provided through the Effective Date. The Plan provides that each professional's fee claim will become an Allowed Administrative Expense only to the extent allowed by Final Order.

### B.      <u>Secured Claims (Classes 1 through 4)</u>

A claim is "secured" when a creditor holds a lien on particular assets ("collateral") to secure payment of the claim. To the extent that the value of the collateral exceeds the principal amount of the secured claim, then the secured claim may include interest, along with reasonable fees and costs of collection that the debtor agreed to pay. If the amount of the secured claim exceeds the value of the collateral, then the claim is considered to be a "secured claim" under bankruptcy law only to the extent of the value of the creditor's interest in the collateral. In certain instances, the value of the collateral is computed after deducting any costs that the bankruptcy estate is entitled to collect from the collateral relating to its preservation or sale. Bankruptcy law requires secured claims to be paid in full unless the secured creditor otherwise agrees.

As of the Petition Date, the following Secured Claims were asserted:

### 1.      City of Malden Secured Claims (Class 1)

Class 1 consists of the Claims of the City of Malden for real estate taxes and water and sewer charges, including without limitation those set forth in the City's proof of claim filed in the case in the amount of $12,013.41 [Claims Register #4-1].

The Plan leaves unaltered the legal, equitable, and contractual rights to which the Class 1 Claim entitles the holder of such Claim. Notwithstanding such non-impairment, the Debtor intends to cause the Class 1 Claim to be paid on the Effective Date from the proceeds of sale of the Property pursuant to the Property APA and Section 5.1 of the Plan.

Class 1 is unimpaired, and hence deemed to accept the Plan. No vote from Class 1 will be solicited.

### 2.      DHCD/CEDAC Secured Claims (Class 2)

Class 2 consists of the Claim of Community Economic Development Assistance Corporation ("CEDAC") and the Claim of the Massachusetts Department of Housing and Community Development ("DHCD") secured by mortgages against the Property and

more particularly described in the proofs of claim filed by each of DHCD and CEDAC [Claims Register #29-1 and #31-1].

On the Effective Date, (i) the Buyer under the Property APA will assume the mortgages securing the Class 2 claims, as modified by assent to the Property APA; and (ii) DHCD will receive a pro rata beneficial interest in the Creditor Trust based on an impaired deemed claim amount of $50,000.  Pursuant to the Property APA, the holder of the Class 2 Claim has agreed that the Buyer of the Property may assume the mortgages (and related collateral assignments of leases and rents) against the Property that secure payment of the Class 2 Claim. It is contemplated that the holder will facilitate, as a lender or agent, additional financing for the Buyer under the Property APA.

Class 2 is impaired and therefore entitled to vote to accept or reject the Plan.

### 3.     Malden Redevelopment Authority Secured Claims (Class 3)

Class 3 consists of the Claims of the Malden Redevelopment Authority as member of and agent for North Suburban Consortium secured by mortgages against the Property and more particularly described in the MRA's two proofs of claim filed in the Case in the amounts of $239,167.68 (regarding 22 Charles Street, Malden) [Claims Register #14-1] (the "MRA Charles Street Claim") and $500,000.00 (regarding 115 Washington Street, Malden) [Claims Register #15-1].

The Plan leaves unaltered the legal, equitable, and contractual rights to which the Class 3 Claims entitles the holder of such Claims including as such rights are modified by such holder's assent to the Property APA, and such rights may be exercised by such holder after the Effective Date in accordance with such assent. On the Effective Date, under the Property APA, the Purchaser will assume the Debtor's obligations to the MRA, as modified by agreement between the Purchaser and MRA. The Debtor is informed that the Purchaser and the MRA have agreed to execute new documentation amending and restating the assumed obligations, and to extend the term of the MRA Charles Street Claim to 24 years from the Effective Date, so that the MRA Charles Street Claim will be fully repaid by regular monthly payments at the specified annual rate of $10,000 per year.

The basis for the Class 3 Claims includes recapture of certain funding grants in the event the Property is utilized for purposes other than low income housing.  Because the purchaser of the Property pursuant to the Property APA will continue to operate the Property as low income housing, the Class 3 Claims will not ripen into actual liabilities of the Debtor's bankruptcy estate, and accordingly there will be no payment on account of the Class 3 Claims under the Plan.

Class 3 is unimpaired, and hence deemed to accept the Plan.  No vote from Class 3 will be solicited.

### 4. Eagle Bank Claims (Class 4)

Class 4 consists of the Claims of Eagle Bank arising under the LIHEAP Settlement Agreement, including the Eagle Bank Secured Claim in the amount of $100,000.00 and the Eagle Bank Deficiency Claim in the amount of $196,400.00.

Class 4 is unimpaired.  The Plan leaves unaltered the legal, equitable, and contractual rights held by Eagle Bank under the LIHEAP Settlement Agreement with respect to the Eagle Bank Secured Claim and the Eagle Bank Deficiency Claim.  The Eagle Bank Secured Claim shall be paid on the Effective Date from the proceeds of sale of the Property pursuant to the Property APA.  The Eagle Bank Deficiency Claim shall constitute an Allowed Class 7 Claim and be entitled to the treatment specified in Section 4.7 of the Plan (i.e., treatment as a general unsecured claim).

Class 4 is unimpaired, and hence deemed to accept the Plan.  No vote from Class 4 will be solicited.

### C. Priority Claims (Class 5)

For reasons of public policy, the bankruptcy law entitles certain types of unsecured Claims arising before the Petition Date—such as certain taxes, customer deposits, wages and employee benefits—to be paid in full prior to other unsecured Claims.

According to the Debtor's Schedules filed with the Bankruptcy Court, as of the Petition Date, the Debtor was liable on a priority basis for certain taxes of approximately $12,000.00 and employee-related claims in an aggregate amount of approximately $600.00, some of which was disputed, and potentially liable to another creditor in an unknown amount.  Under the Plan, Allowed Priority Claims will be paid in full on the Effective Date.  The Debtor currently expects that Allowed Priority Claims will total approximately $12,000, based on filed and scheduled claims.

Allowed Priority Claims are placed in Class 5, and are unimpaired and hence deemed to accept the Plan.  No vote from Class 5 will be solicited.

### D. LIHEAP Claim (Class 6)

The LIHEAP Claim is held by National Grid on account of its claim for unpaid fuel deliveries.  Pursuant to the LIHEAP Settlement Agreement, National Grid is entitled to receive payment of the LIHEAP Settlement Funds (the $296,399.52 paid by Eagle Bank under the settlement). Separately, National Grid has agreed as part of the overall Plan negotiations to share some of its recovery with general unsecured creditors. This arrangement is provided for by Section 4.6 of the Plan.  Section 4.6 provides that, on the Effective Date, the Debtor shall distribute all of the LIHEAP Settlement Funds to National Grid as the holder of the Allowed Class 6 Claim, and National Grid will authorize payment of the National Grid Contribution which will be available for distribution to holders of Allowed Class 7 claims under the Plan.  Giving effect to the

Class 6 distribution of the LIHEAP Settlement Funds and the National Grid Contribution, National Grid will be deemed to hold an Allowed Class 7 Claim in the amount of $300,028.58, solely for purposes of the Creditor Trust Instrument (i.e., the holder of the Allowed Class 6 Claim shall not be entitled to any distribution of Class 7 Distributable Cash but shall be entitled to a beneficial interest in the Creditor Trust).

The Plan classifies the unsecured LIHEAP claim of National Grid (in Class 6) separately from other unsecured claims (Class 7) due to the distinct legal rights to payment for the LIHEAP Claim. The LIHEAP Settlement Funds are directly traced, through the Eagle Bank setoff, to funds received by the Debtor in November 2014 from DHCD under a restricted government LIHEAP grant. Funds from that grant are designated for participants in the specific designated program. The LIHEAP Settlement Agreement reflects and respects this restriction, and the use of the LIHEAP Settlement Funds only to pay the LIHEAP-related claim of National Grid is a key condition to agreement. Because of the distinct legal right of National Grid (as the Debtor's only LIHEAP creditor), the Debtor and the parties to the LIHEAP Settlement Agreement believe that the separate classification is warranted and justified – indeed, required -- under applicable law.

The Class 6 Claim is impaired and therefore entitled to vote to accept or reject the Plan.

### E.    General Unsecured Claims (Class 7)

Unsecured claims not entitled to priority under the Bankruptcy Code are called "general unsecured claims." In order to be Allowed, a General Unsecured Claim must (a) either be set forth in a proof of claim properly filed with the Court on or before the Bar Date or be listed by the Debtor in its schedules filed with the Court as an obligation other than a liability that is disputed, unliquidated or contingent, and (b) not be Disallowed by Order. For more information on the process by which Claims are Allowed, see Section VI.A, "How Claims are Allowed," below.

The Debtor's books and records indicate that its unsecured liabilities for goods and services unpaid as of the Petition Date were approximately $1,345,000, excluding claims entitled to priority under the Bankruptcy Code. The Debtor currently projects that General Unsecured Claims will be Allowed in a range of from $1.2 million to $1.3 million, excluding any claims arising from the rejection of executory contracts, which the Debtor estimates to be zero.

Under the Plan, holders of allowed general unsecured claims will receive a share of certain cash available as of the effective date of the Plan, and will also receive a beneficial interest in the creditor trust established to administer certain non-cash assets. More specifically, under Section 4.7 of the Plan, each holder of an Allowed Class 7 Claim (i) shall be entitled to a Pro Rata distribution of the Class 7 Distributable Cash and (ii) shall be deemed to hold a beneficial interest in the Creditor Trust pursuant to Sections 5.4 and 5.5 of the Plan and to be entitled to distributions on account of its Allowed Class 7 Claim in accordance with the Creditor Trust Instrument.

Class 7 General Unsecured Claims are impaired and therefore entitled to vote to accept or reject the Plan.

## VI.   Allowance of Claims

### A.   How Claims are Allowed

No Claim will be paid unless it is Allowed. Any Claim as to which liability and amount are determined by a Final Order of the Bankruptcy Court (or such other court or forum as the Creditor Trustee and the holder of such Claim agree to or as the Bankruptcy Court may direct) shall be Allowed in such amount. If you hold a Claim that arose before the Petition Date, and you filed a proof of claim before the Bar Date established by the Court,[2] then your Claim will automatically be Allowed unless it is the subject of an objection prior to the deadline for filing objections to claims to be established by the Bankruptcy Court. Even if you did not file a proof of claim, if your Claim is listed in the Schedules filed by the Debtor as an obligation that is not disputed, unliquidated or contingent, then your Claim will automatically be Allowed in the amount listed in the Schedules, unless it is the subject of an objection or an amendment to the Schedules. If a creditor files a proof of claim for an asserted liability that has already been listed in the Schedules, the proof of claim filed by the creditor supersedes and replaces the Claim listed in the Schedules. If an objection is filed to your Claim, then you will receive written notice, an opportunity to respond and a hearing before the Court on any disputed issues. The Court will then determine the Allowed Amount of your Claim, if any.

If your Claim is Allowed as just described, then you will be entitled to distributions under the Plan based on the Allowed Amount of your Claim. There is nothing else you need to do, provided that the Debtor and (as appropriate) the Creditor Trustee has your correct address. See Section VII(A), "Changes of Address," below.

No disputed Claim shall be Allowed except in the amount either agreed upon between the holder of such Claim and the Debtor or the Creditor Trustee, or as determined by a Final Order of the Bankruptcy Court (or such other court or forum as the Creditor Trustee and the holder of such Claim agree to or as the Bankruptcy Court may direct).

Concerning Claims arising on and after the Petition Date, see Section VI.A.1 "Administrative Expenses in General," above.

### B.   Late-Filed Claims and Amendments

Each Claim as to which a proof of claim was required to be filed on or before the Bar Date and as to which a proof of claim was not filed on or before the Bar Date will be

---

[2] See Section IV.F.1, "Bar Date," above, for a discussion of the Bar Date.

Disallowed pursuant to the Plan as of the Effective Date without any further notice to such creditor or any further action, order or approval of the Court and holders of such claims will not receive any distributions on account of such claims, unless such late proof of claim is deemed timely filed by a final order of the Court.  A proof of claim that has not been timely filed will be of no force or effect whatsoever, including for purposes of any distribution under the Plan; nor will any action (including giving notice to the Debtors or otherwise making an "informal" proof of claim) serve for purposes of the Plan and distributions required of the Creditor Trust as a substitute for timely filing a proof of claim.  In no event will the Allowed Amount of any Claim exceed the amount set forth in a proof of claim therefor filed on or before the Bar Date except to the extent that the claimant has obtained prior to entry of the Confirmation Order, on notice to the Debtor and the Creditors' Committee, an Order permitting the filing of an amended proof of such Claim increasing the amount thereof.  After entry of the Confirmation Order, no Order allowing or disallowing a Claim may be reconsidered, pursuant to Code Section 502(j) or otherwise, so as to increase the Allowed Amount thereof.

### C.   **Claims Subject to Pending Objection**

No payments or distributions shall be made with respect to all or any portion of an Unresolved Claim unless and until all objections to such Unresolved Claim have been settled or withdrawn or have been determined by Final Order, and the Unresolved Claim, or some portion thereof, has become an Allowed Claim.  To the extent that an Unresolved Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in  accordance with the provisions of the Plan, without any interest to be paid on account of the time period during which such Claim was Unresolved.

All Claims of any entity that owes money or property to or asserts disputed possession of or control over property of the Debtor shall be deemed to be Unresolved and shall not be Allowed unless and until such entity pays in full any amount or returns any property of or owed to the Debtor.

### VII.   **Distributions to Creditors**

Unless otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, at such time as the Claim becomes Allowed or as soon as practicable thereafter), each holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Subject to Bankruptcy Rule 9010, and unless otherwise provided herein, any Plan distribution or delivery to a holder of an Allowed Claim shall be made at the last known address of such holder as set forth (a) in the Schedules filed with the Bankruptcy Court unless the Debtors have been notified in writing of a change of address, including by the

filing of a Proof of Claim by such holder that contains an address for such holder different from the address reflected in such Schedules for such holder, (b) on the Proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such holder giving details of a change of address.  If any Plan distribution is returned as undeliverable, no Plan distributions shall be made to such holder unless the Debtors are notified of such holder's then current address within ninety (90) days after such Plan distribution was returned.  After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan distribution and the undeliverable Plan distributions shall constitute part of the Estate Reserve used to make other Plan distributions or to be turned over to the Creditor Trustee as additional Creditor Trust Assets.

### A.    Changes of Address

If your address has changed since you filed your proof of claim, or if it changes in the future, please notify the Debtor (or the Creditor Trustee, once appointed) of your new address.  Similarly, if you did not file a proof of claim and have any reason to believe that the Debtor does not have your correct current address, please notify the Debtor of your address.  Notices may be sent to counsel to the Debtor at the following address:

> Casner & Edwards, LLP
> Attn:  John T. Morrier, Esq.
> 303 Congress Street
> Boston, Massachusetts 02210

### B.    Transfer of Claims

If you are the transferee of a Claim, whether before or after the Effective Date, you are required to comply with Rule 3001(e) of the Federal Rules of Bankruptcy Procedure.  Notice of any transfer must be served on the Debtor at the address set forth in the preceding section.

## VIII.  Executory Contracts and Unexpired Leases

### A.    Assumption and Rejection

The Bankruptcy Code permits the rejection of executory contracts and unexpired leases that are burdensome to the Chapter 11 estate.  Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtor shall be deemed to have rejected each executory contract and unexpired lease to which it is a party, unless such contract or lease: (a) was assumed or rejected previously by the Debtor; (b) is to be assumed and assigned pursuant to the Plan, the Property APA, or the Confirmation Order; (c) previously expired or terminated pursuant to its own terms; or (d) is the subject of a motion to assume filed on or before the entry of the Confirmation Order.  The Confirmation Order shall constitute an order of the

Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above as of the Effective Date.

### B.   Rejection Damage Claims

If the rejection of an executory contract or unexpired lease by the Debtor results in damages to the other party or parties to such contract or lease, a Claim for such damages will be forever barred and will not be enforceable against the Debtor, the Debtor's estate, the Creditor Trust or any properties thereof, whether by way of setoff, recoupment, or otherwise, unless a proof of claim therefor is filed not later than the earlier of (i) any applicable deadline established by Order, or (ii) thirty (30) days after the Effective Date.

## IX.   Other Provisions of the Plan

### A.   Exculpation Regarding Chapter 11 Matters

The Plan provides that neither the Debtor, nor its bankruptcy estate, nor the Creditors' Committee, nor any member of the Creditors' Committee, nor any officer, director, shareholder, affiliate, partner, member, employee, agent, financial advisor, attorney or other professional of any of the foregoing, will have or incur any liability to any holder of a Claim, nor to any other entity, for any act, event or omission in connection with or arising out of the Case, commencement of the Cases, the Plan or implementation of the Plan, except for gross negligence or willful misconduct.

### B.   Creditors' Committee

On the Effective Date, any committee appointed in the Case, including the Creditors' Committee, pursuant to section 1102 of the Bankruptcy Code shall be dissolved, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Case.

### C.   The Creditor Trust

On or before the Effective Date, the Debtor shall execute the Creditor Trust Instrument, in a form acceptable to the Creditors' Committee, and all other necessary steps shall be taken to establish the Creditor Trust.

On the Effective Date, the Debtor shall transfer to the Creditor Trust the Creditor Trust Assets, which property shall automatically vest in the Creditor Trust for the benefit of the holders of General Unsecured Claims, free and clear of all liens, claims, and encumbrances, pursuant to section 1141 of the Bankruptcy Code, except to the extent set forth in the Plan, the Creditor Trust Instrument, or the Confirmation Order.

The Creditor Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. Accordingly, the Creditor Trustee shall, in an expeditious but orderly manner, liquidate

and convert to Cash the Creditor Trust Assets, make timely distributions to the holders of Allowed General Unsecured Claims of Cash and property and not unduly prolong its duration.  The Creditor Trust shall not be deemed a successor-in-interest of the Debtor for any purpose other than as specifically set forth herein or in the Creditor Trust Instrument.

The Creditor Trust shall be governed and administered by the Creditor Trustee subject to the terms of the Plan and the Creditor Trust Instrument.  The Creditor Trustee shall distribute to holders of Allowed General Unsecured Claims the Cash generated through administration of the Creditor Trust Assets in accordance with the Plan and the Creditor Trust Instrument, beginning on the Effective Date.

All holders of Allowed General Unsecured Claims shall furnish to the Creditor Trustee its, his or her employer or taxpayer identification number ("TIN") as assigned by the Internal Revenue Service within thirty (30) days of a written request for such TIN by the Creditor Trustee.  If a holder of an Allowed General Unsecured Claim fails to provide the Creditor Trustee with the requested TIN within thirty (30) days of the written request, such holder shall be deemed to have waived: (a) its, his or her interest in the Creditor Trust, including the right to receive a distribution, and (b) its, his or her rights and Claims under this Plan, including the right to receive a Plan distribution.

Any Creditor Trust distribution or delivery to a holder of an Allowed General Unsecured Claim shall be made at the last known address of such holder as set forth (a) in the Schedules filed with the Bankruptcy Court unless the Creditor Trustee has been notified in writing of a change of address, including by the filing of a Proof of Claim by such holder that contains an address for such holder different from the address reflected in such Schedules for such holder, (b) on the Proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such holder giving details of a change of address.  If any Creditor Trust distribution is returned as undeliverable, no Creditor Trust distributions shall be made to such holder unless the Creditor Trustee is notified of such holder's then current address within ninety (90) days after such Creditor Trust distribution was returned.  After such date, if such notice was not provided, a holder shall have forfeited its right to such Creditor Trust distribution and the undeliverable Creditor Trust distributions made to any holder of an Allowed General Unsecured Claim on account of such Allowed General Unsecured Claim shall revert to the Creditor Trust for distribution to the holders of Allowed General Unsecured Claims.

The amount of any checks issued by the Creditor Trustee under the Plan that remain uncashed for a period of one hundred twenty (120) days after the date of such distribution and shall revert to the Creditor Trust free and clear of any claim, lien or interest of the entity to whom the check was issued.  No distributions of less than twenty-five dollars ($25.00) need be made by the Creditor Trustee to any holder of an Allowed General Unsecured Claim.  Any amounts that revert to the Creditor Trust as set forth above shall become part of the Creditor Trust Assets and shall be included in any subsequent distributions made pursuant to the Plan and the Creditor Trust.

Holders of General Unsecured Claims shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Creditor Trust Assets. The beneficial interests in the Creditor Trust shall not be certificated, except as otherwise provided in the Creditor Trust Instrument.

The Creditor Trustee and the Creditor Trust shall be discharged or dissolved, as the case may be, at such time as (i) all Creditor Trust Assets have been liquidated; (ii) all distributions required to be made by the Creditor Trustee under the Plan have been made; and (iii) the Creditor Trust is otherwise fully administered. In no event shall the Creditor Trust be dissolved later than six (6) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the sixth (6th) anniversary (and, in the case of any extension, within six (6) months prior to the end of such extension), determines that a fixed period extension (not to exceed three (3) years together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Creditor Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Creditor Trust Assets or the dissolution of the Debtor.

### D.    Effective Date

The Effective Date of the Plan is significant to creditors primarily because it triggers the payment of Plan distributions to holders of Allowed Claims and the transfer to the Creditor Trust of the Creditor Trust Assets. The Effective Date will occur on the date on which all conditions to the Property APA are satisfied or waived. The transactions contemplated by the Property APA, the LIHEAP Settlement Agreement and the National Grid Sharing Agreement shall be conducted in a simultaneous closing on the Effective Date. The Debtor estimates that the Effective Date will occur within 120 days after the initial filing of the Plan, unless extended pursuant to the Property APA or by agreement. After the occurrence of the Effective Date, the Court will retain jurisdiction for certain limited purposes, such as resolving objections to Claims and enforcing the Plan.

### E.    Binding Effect; Discharge

On the Effective Date, the terms of the Plan shall be immediately effective, enforceable, binding upon the Debtors, the Creditor Trustee, any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each entity acquiring property pursuant to the Plan (including pursuant to the Property APA), and any and all nondebtor parties to executory contracts and unexpired leases with the Debtor.

If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court

shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with applicable law and the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted, provided that any such alteration or interpretation, other than as required by applicable law, must be in form and substance reasonably acceptable to the Debtor and the Creditors' Committee; provided, however, that the Debtor may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing. Notwithstanding any such order by the Bankruptcy Court, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms

Entry of the Confirmation Order will be deemed to be a determination by the Court only as to the matters expressly set forth therein and not as to any other matter involving the Debtor, its estate and any party-in-interest in the Case. Accordingly, if you have an objection to any provision of the Plan, you must object to confirmation in the manner and within the time described in the notice included with this Disclosure Statement.

The Plan also provides that all causes of action of the Debtor's estate and all objections to Claims are preserved and transferred to the Creditor Trust, except any causes of action released pursuant to the Plan. Accordingly, all parties must assume that the rights of the Debtor or the Creditor Trustee to prosecute an action or objection to any Claim by or on behalf of the Creditor Trust will not be limited by reason of *res judicata*, collateral estoppel or any other legal doctrine, in connection with the Plan.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of claims, interests, and causes of action of any nature whatsoever, whether known or unknown, including any interest accrued on claims from and after the Petition Date, against the Debtor or any of its assets or properties, in each case whether or not: (1) a Claim based upon such claim, interest or cause of action is Allowed pursuant to section 502 of the Bankruptcy Code; or (2) the holder of such a Claim or interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan. Nothing in this paragraph shall impair the police or regulatory powers of the United States of America or any governmental unit thereof specified in section 101(27) of the Bankruptcy Code.

## X.    Avoidance Actions

### A.    Preferential or Fraudulent Transfers

The bankruptcy law permits a Chapter 11 debtor's bankruptcy estate to avoid and recover certain transfers of an interest of the debtor in property, if the transfers were made within 90 days before the bankruptcy filing or, in the case of a transfer to an insider of the debtor, within one year before the bankruptcy filing.  In general terms, such a preferential transfer can be recovered if it was made by an insolvent debtor, to or for the benefit of a creditor, and account of an antecedent debt, if the transfer allowed the creditor to receive more than it would have under a Chapter 7 liquidation.  However, various defenses are available.  An otherwise preferential transfer is excepted from recovery if, for example, the transfer was made in the ordinary course of business, or the creditor receiving the transfer provided the debtor with new value (such as additional products or services) after the transfer.

Federal bankruptcy law and state law permit a Chapter 11 debtor's bankruptcy estate to recover fraudulent transfers.  There are two primary categories of transfers which could be fraudulent: first, in general terms, transfers made for less than reasonably equivalent value while the debtor was in financial distress; and second, transfers made by the debtor with actual intent to hinder, delay or defraud its creditors.

Under the Plan, the right to pursue recovery of alleged preferential transfers and alleged fraudulent transfers, excepting claims released pursuant to the Plan, will be transferred to the Creditor Trust.  The Creditor Trustee will have the sole authority and responsibility to pursue any preference actions and fraudulent transfer actions against any party alleged to have received such a transfer from the Debtor.

## XI.  Certain U.S. Federal Income Tax Consequences of the Plan

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION AND MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims.

The following summary is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof.

Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, governmental authorities or agencies and investors in pass-through entities).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### A.    Consequences to Debtor

The Debtor is a non-profit corporation established under Massachusetts General Laws Chapter 180, and is a tax exempt organization pursuant to state and federal law. Because of its tax-exempt status, the Debtor is exempt from federal taxation, on both its ordinary income and any capital gains. One major exception to the tax exemption is the "unrelated business income" provision. An activity is an unrelated business (and income therefrom is subject to unrelated business income tax) if it meets three requirements: (i) it is a trade or business; (ii) it is regularly carried on, and (iii) it is not substantially related to furthering the exempt purpose of the organization. Gains or losses from the sale, exchange or other disposition of property are expressly excluded from unrelated business taxable income. See IRS Publication 598 (Rev. March 2010 at p. 10). The proceeds of the Property Sale transaction are not taxable income for the Debtor because, among other reasons, this one-time sale of a substantial asset is not an activity "regularly carried on" by the Debtor and because the transaction falls squarely within the stated exclusion cited above. Accordingly, the Debtor will not incur federal or state or state income tax liabilities as a result of the Property Sale transaction.

In addition to the foregoing, Internal Revenue Code section 108(a)(1) provides for an exclusion from gross income of any cancellation of indebtedness which occurs in a case under title 11 of the United States code, such as the Debtor's Chapter 11 case.

For these reasons, the Debtor believes that there will be no material tax consequences to the Debtor as the result of the Plan.

### B.   Consequences to Holders of Secured Claims and General Unsecured Claims

The Debtor believes that the Plan should be treated as a plan of liquidation for U.S. federal income tax purposes because the Creditor Trust is being created solely for the purpose of litigating the Estate Causes of Action and winding up the Debtor's affairs.

### 1.   Gain or Loss

In general, a holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim representing accrued but unpaid interest).  For a discussion of the U.S. federal income tax treatment of any Claim for accrued but unpaid interest, *see* "Distributions in Discharge of Accrued Interest," below.

In general, the "amount realized" by a holder will equal the sum of (a) the amount of any cash received by such holder (excluding any portion required to be treated as imputed interest due to the post-Effective Date distribution of such cash, as discussed below) and (b) the fair market value of its undivided interest in the other underlying assets of the Creditor Trust (subject to any liabilities assumed by the Creditor Trust or to which such assets are subject) on the Effective Date.  Although subject to significant uncertainty, the Debtor believes that any distributions of cash to a holder of a Claim after the Effective Date (in contrast to a distribution from the Creditor Trust, as discussed below) should be treated as a distribution in liquidation (satisfaction) of such holder's Claim.

As discussed herein and in the Plan, certain Claim holders will receive a beneficial interest in the Creditor Trust entitling them to share in any proceeds from liquidation of the Creditor Trust Assets.  For U.S. federal income tax purposes, because the Creditor Trust has been structured to qualify as a "grantor trust," each recipient of an interest in the Creditor Trust will be treated as directly receiving, and as a direct owner of, its allocable percentage of the Creditor Trust Assets, and the proceeds thereof.  See "Tax Treatment of the Creditor Trust and Holders of Beneficial Interests" below.  Accordingly, as noted above, each holder would take into account in determining the "amount realized" in respect of its Claim its share of any cash and the fair market value of its undivided interest in the other underlying assets of the Creditor Trust (subject to any liabilities assumed by the Creditor Trust or to which such assets are subject) as if received and held directly.  Pursuant to the Plan, the Creditor Trustee will make a good faith valuation of the Creditor Trust Assets, and all parties must consistently use such valuation for all U.S. federal income tax purposes.  The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Any amount a holder receives following the Effective Date as a distribution in respect of an interest in the Creditor Trust should not be included for U.S. federal income tax purposes in the holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such holder's interest in the

28

Creditor Trust.  See "Tax Treatment of the Creditor Trust and Holders of Beneficial Interests," below.

Where gain or loss is recognized by a holder in respect of its Allowed Claim, the character of such gain or loss (as long-term or short-term capital, or ordinary) will be determined by a number of factors, including the tax status of the holder, whether the Claim in respect of which any property was received constituted a capital asset in the hands of the holder and how long it had been held, the manner in which a holder acquired such Claim, whether such Claim is an installment obligation for U.S. federal income tax purposes, whether such Claim was originally issued at a discount or acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.

A holder's initial aggregate tax basis in its undivided interest in the underlying assets of the Creditor Trust generally will equal the fair market value of such interest when received.  A holder's holding period in any property received generally will begin the day following the Effective Date (or such later date as the holder's Claim was Allowed).

## 2.      Distributions in Discharge of Accrued Interest

Pursuant to the Plan, all distributions in respect of a Claim will be allocated first to the principal amount of the Claim (as determined for U.S. federal income tax purposes), with any excess allocated to the portion of the Claim representing accrued but unpaid interest.  However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.  In general, to the extent any amount received (whether stock, cash or other property) by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Such loss may be ordinary, but the tax law is unclear on this point.  Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

## 3.      Information Reporting and Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding (including employment tax withholding).  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate.  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.

Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, taxpayers are required to disclose on their U.S. federal income tax return of certain types of transactions in which the taxpayer participated after January 1, 2003, including, among other types of transactions, the following:  (a) certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds; and (b) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year.  These categories are very broad; however, there are numerous exceptions.  Holders are urged to consult their tax advisors regarding these rules and whether the transactions contemplated by the Plan would be subject to these rules and require disclosure on the holders' tax returns.

## C.    Tax Treatment of the Creditor Trust and Holders of Beneficial Interests

Upon the Effective Date, the Creditor Trust shall be established for the benefit of holders of Allowed Class 7 Claims (General Unsecured Claims), whether Allowed on or after the Effective Date.

### 1.    Classification of the Creditor Trust

The Creditor Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust, which is a disregarded entity.

However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes.  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Creditor Trust has been structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtor, the Creditor Trustee, and holders of General Unsecured Claims) are required to treat, for U.S. federal income tax purposes, the Creditor Trust as a grantor trust of which the holders are the owners and grantors.  The following discussion assumes that the Creditor Trust will be so respected for U.S. federal income tax purposes.  However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Creditor Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  Were the IRS successfully to challenge such classification, the U.S. federal income tax consequences to the Creditor Trust, the holders of General Unsecured Claims, and the Debtor could vary from those discussed herein (including the potential for an entity level tax on any income of the Creditor Trust).

### 2.      General Tax Reporting by the Trust and Beneficiaries

For all U.S. federal income tax purposes, all parties (including the Debtor, the Creditor Trustee, and the holders of General Unsecured Claims) must treat the transfer of Creditor Trust Assets to the Creditor Trust as a transfer of such assets directly to the holders, followed by the transfer of such assets by the holders to the Creditor Trust. Consistent therewith, all parties must treat the Creditor Trust as a grantor trust of which such holders are the owners and grantors.  Thus, such holders (and any subsequent holders of interests in the Creditor Trust) will be treated as the direct owners of an undivided interest in the assets of the Creditor Trust for all U.S. federal income tax purposes.  Pursuant to the Plan, the Creditor Trust will determine the fair market value of the assets of the Creditor Trust as of the Effective Date, and all parties, including the holders, must consistently use such valuation for all U.S. federal income tax purposes, such as in the determination of gain, loss, and tax basis.  The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Accordingly, each holder will be required to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Creditor Trust.  *See* "Allocation of Taxable Income and Loss" below. The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The U.S. federal income tax reporting obligations of a holder are not dependent upon the Creditor Trust distributing any cash or other proceeds.  Therefore, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Creditor Trust even if the Creditor Trust has not made a concurrent distribution to the holder.  In general, a distribution of cash by the Creditor Trust to a holder will not be taxable to the holder as such holder is regarded for U.S. federal income tax purposes as already owning the underlying assets or realizing the income.

The Creditor Trustee will file with the IRS returns for the Creditor Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).  The Creditor Trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction, or credit and will instruct the holder to report such items on its U.S. federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their U.S. federal income tax returns.  Such items generally would be reported on the holder's state and/or local tax returns in a similar manner.

### 3.      Allocation of Taxable Income and Loss

The Plan provides that allocations of Creditor Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein or in the Plan) if, immediately prior to such deemed distribution, the

31

Creditor Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Creditor Trust interests, taking into account all prior and concurrent distributions from the Creditor Trust. Similarly, taxable loss of the Creditor Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Creditor Trust Assets. The tax book value of the Creditor Trust Assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the Treasury Regulations and any other applicable administrative and judicial authorities and pronouncements.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. THE FOREGOING SUMMARY ALSO DOES NOT DISCUSS ASPECTS OF FOREIGN TAXATION LAWS AND REGULATIONS THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XII.   **Acceptance and Confirmation of Plan**

### A.   **Acceptance of the Plan**

Bankruptcy law provides that any class of creditors whose rights are "impaired" (that is, not fully honored) under a proposed plan of reorganization or liquidation has the right, as a class, to accept or reject the plan. Each member of the class may vote on this decision. A class of creditors accepts a plan if ballots cast in favor of the plan represent more than one-half in number and at least two-thirds in dollar amount of the claims for which ballots are timely received. A class of equity interests accepts a plan if ballots cast in favor of the plan represent at least two-thirds in amount of the interests for which ballots are timely received.

Claims in Classes 1, 3, 4 and 5 are unimpaired. Accordingly, these classes are deemed to have accepted the Plan and no votes will be solicited from holders of claims in these claim Classes.

Claims in Class 2, Class 6 and Class 7 are impaired. The holders of Claims in Class 2, Class 6 and Class 7 are therefore entitled to vote to accept or reject the Plan.

For creditors entitled to vote, instructions for completing and returning the ballot are found on the ballot itself. If you hold a Class 2, Class 6 or Class 7 Claim, you should first review this Disclosure Statement and the Plan and then complete the ballot. In

order for your vote to count, it must be **ACTUALLY RECEIVED** not later than **July 5, 2017 at 4:30 p.m. prevailing Eastern Time** by the Debtor at the following address:

> Casner & Edwards, LLP
> Attn:  John T. Morrier, Esq.
> 303 Congress Street
> Boston, Massachusetts 02210

Submission of ballots by facsimile, or by any means not including an authorized signature in ink, is prohibited.

ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED.

All votes to accept or reject the Plan must be cast by using the ballot provided, or a copy of the ballot provided.  The ballot must be signed by the holder of the Claim, or by an officer, partner or authorized agent of such holder.  Ballots signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity should indicate such capacity and be accompanied by proper evidence satisfactory to the Debtor of their authority to so act.  Please be sure to fill in the name of the creditor on whose behalf the ballot is being filed.

The voting procedures Order approved by the Court permit the Debtor, in consultation with the Creditors' Committee, to waive certain of the above requirements in certain instances.

On each ballot there is a space in which to write the amount you believe is the amount of your Claim.  However, if this amount differs from the actual Allowed Amount of your Class 2 Claim, Class 6 Claim, or Class 7 Claim then the actual Allowed Amount of the Claim is the amount for which your vote will be counted.  **THE AMOUNT OF THE CLAIM SPECIFIED ON YOUR BALLOT WILL NOT SUPERSEDE OR AMEND ANY PROOF OF CLAIM FILED WITH RESPECT TO YOUR CLAIM.**  In addition, the Debtor reserves all rights they may have to object to any particular Claim or to the voting of any particular Claim.

## B.     Confirmation of the Plan

The Court will hold a confirmation hearing before deciding whether to confirm the Plan.  Once confirmed, the Plan will become effective on the Effective Date.  For a discussion of the Effective Date, see Section IX.D., "Effective Date," above.

A hearing on confirmation of the Plan, and on any objections to the Plan, will be held on July 10, 2017 at11:30 a.m. before the Honorable Joan N. Feeney, in the United States Bankruptcy Court, John W. McCormack Post Office and Federal Building, 5 Post Office Square, Boston, Massachusetts.  The confirmation hearing may be adjourned

from time to time by the Court without further notice, except for an announcement made at the confirmation hearing or any adjournment of that hearing.  In order to object to confirmation of the Plan, a creditor or other party in interest must file a written objection with the Clerk of the United States Bankruptcy Court, and serve a copy of the objection on:

|  |  |
|---|---|
| Counsel to the Debtors: | John T. Morrier, Esq.<br>Casner & Edwards, LLP<br>303 Congress Street<br>Boston, Massachusetts 02210 |
| Counsel to the Creditors'<br>Committee: | Kate E. Nicholson, Esq.<br>Nicholson Herrick  LLC<br>21 Bishop Allen Drive<br>Cambridge, MA 02139 |

Objections must be filed and served by not later than 4:30 p.m. on July 5, 2017.  In order to preserve an objection, anyone filing an objection to confirmation must also attend the hearing on confirmation, either in person or through counsel, except that a corporation may appear only through counsel.

Code Section 1128(b) provides that any party in interest may object to confirmation of a plan.  Objections to confirmation of the Plan are governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure.  **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE COURT**. The Debtor and the Creditors' Committee reserve the right, in order to resolve any objection to confirmation of the Plan or otherwise, to modify the Plan without further notice or disclosure, so long as the modification does not adversely change the treatment of any creditor who has not accepted the modification.

The Plan will be confirmed if it meets the requirements set forth in the bankruptcy law.  Among the most significant requirements are:

- The Plan must have been accepted by at least one impaired class of creditors.

- If any class does not accept the Plan, the Court must find that the Plan is fair and equitable to, and does not unfairly discriminate against, such class.

- If any creditor does not accept the Plan, the Court must determine that the Plan provides such creditor with at least as great a distribution as the creditor would receive in a Chapter 7 liquidation.

34

- The Court must determine that confirmation of the Plan is not likely to be followed by the need for liquidation or further reorganization, except as contemplated by the Plan.

The Debtor and the Creditors' Committee believe that the foregoing requirements are or will be met. If the Court determines that all confirmation requirements are satisfied, it will enter an order confirming the Plan.

## XIII.  <u>Alternatives to the Plan</u>

The Debtor has ceased all business operations and has liquidated, or will liquidate pursuant to the Plan, all of its remaining assets. There is no alternative to the Plan that would provide for continuation of the Debtor as an ongoing business. The two available approaches to liquidation are conversion to Chapter 7 or liquidation under the Plan.

The Debtor and the Creditors' Committee have determined that the Plan represents the more efficient and cost-effective approach to liquidating the Debtor's remaining assets because (a) the procedural costs inherent in converting the Cases to Chapter 7, including administrative expenses of the Chapter 7 trustee and professional persons engaged by the trustee, would likely reduce the ultimate distribution to the Debtor's creditors, (b) conversion to Chapter 7 would significantly delay the distribution to creditors because, among other things, a new deadline for creditors to file claims in the Chapter 7 cases would be established and the Chapter 7 trustee would have to spend time (and money) getting up to speed on the Debtor's case, and (c) there is no assurance that a Chapter 7 trustee would be able to reach consensual agreements following such delay on the terms of the LIHEAP Settlement Agreement, National Grid Sharing Agreement, and the Property APA that serve as the foundation of the Plan and avoid the delay and expense of further litigation of claims by and against the Debtor. Accordingly, the Debtor and the Creditors' Committee believe that the Plan is the best mechanism to provide the earliest possible dividend to creditors, while at the same time permitting the orderly completion of the liquidation process.

## XIV.  <u>Conclusion</u>

The Debtor would like to express its appreciation for the patience and cooperation of creditors during its Chapter 11 case. The Debtor believes that the Plan represents the best possible outcome for all involved and accordingly urges you to accept the Plan.

Tri-City Community
 Action Program, Inc.
By its attorneys,


/s/ John T. Morrier
John T. Morrier BBO# 628624
A. Davis Whitesell BBO# 551462
Casner & Edwards, LLP
303 Congress Street
Boston, MA 02210
(617) 426-5900
morrier@casneredwards.com
whitesell@casneredwards.com

Dated: May 24, 2017

58492/675277v3